PER CURIAM.
E.W. (“the mother”) appeals the termination of her parental rights to her child, S.W. (“the child”).
The mother has four children. One child lives with his father, one child lives with the maternal grandmother, and the other two children, including the child as to whom the mother’s parental rights have been terminated, are in foster care. The *169 child was born on November 25, 1999; at the time of her birth, the child tested positive for amphetamines and opiates. One week after the child’s birth, the Jefferson County Department of Human Resources (“DHR”) filed a petition seeking custody of the child. The trial court conducted a hearing, determined that the child was dependent, and placed her temporarily with an aunt. On January 21, 2000, the trial court awarded DHR custody of the child, and the child was placed-in foster care.
On April 26, 2001, DHR petitioned ■ to terminate the mother’s parental rights. The trial court held a hearing on that petition on April 12, 2002.
The mother has a long history of criminal activity. At the time of ‘the termination hearing, the mother was an inmate at Julia Tutwiler Prison. The mother testified that she had served 1 year of a 15-year sentence for a conviction for possession of cocaine. The mother had been incarcerated previously for approximately two years for offenses similar to that for which she was serving a prison sentence at the time of the termination hearing. The mother stated that she had a total of six felony convictions; five of those convictions were for possession of controlled substances, and one was for receiving stolen property. The mother also had several misdemeanor convictions, including convictions for possession of drug paraphernalia and prostitution. The mother testified that she was scheduled to be released from prison on November 23, 2005, but that she believed she qualified for an early release in February 2003. Later in her testimony, however, she admitted that the earliest she could be released from prison was November 2003. The mother testified that, upon her release from prison, she planned to move to Virginia to live with her mother.
The mother .was not incarcerated for approximately 18 months between November 1999 and April 2001. As a part of her February 15, 2000, Individualized Service Plan (“ISP”), the mother agreed to complete an outpatient substance-abuse program and to remain free of illegal drugs. The mother testified that she did not recall agreeing to those conditions; she admitted that she had not remained drug free.
The mother stated that she had been using illegal drugs for eight years. The mother has attended four or five residential drug-treatment programs and has completed only one of those programs. However, she testified that “none of the programs ... did [her] any good.” After each of the drug-treatment programs, including the one she completed, the mother returned to using drugs, usually crack cocaine. The mother testified that she had been drug free for a little more than one year, from February 2000 to April 2001, and that she planned to stay off drugs once she was released from her current incarceration. The mother testified that she had attended several self-help programs in prison, including a series on overcoming criminal thinking, a program on stress management, and a relationship class. The mother also attended Alcoholics Anonymous and Narcotics Anonymous sessions while in prison.
The mother stated that she had asked to participate in a six-month drug-abuse program at Tutwiler; that program required inmates to live in a special “drug dorm.” The mother was accepted into that program and lived in the drug dorm for awhile, but she was dismissed from the program because of her failure to cooperate and her failure to follow orders. The mother stated that after her release from prison, she intended to remain drug free.
The mother first argues that the trial court improperly admitted certain evi *170 dence that she contends constituted inadmissible hearsay. The mother properly objected to the admission of DHR’s Exhibit 4, which was an April 17, 2002, court report prepared by Chanell Boykin, a DHR social worker. The mother objected to DHR’s Exhibit 4 on the basis that the report contained inadmissible hearsay. In her brief to this court, the mother cites Y.M. v. Jefferson County Department of Human Resources, [Ms. 2010755, Jan. 24, 2003] — So.2d -(Ala.Civ.App.2003), in support of her contention that that exhibit contained hearsay that was not admissible at the termination hearing.
In Y.M., two members of this court concurred in an opinion that concluded that certain DHR court reports contained hearsay that was inadmissible in a hearing on a petition to terminate a parent’s parental rights. The parties in Y.M. did not argue or present evidence to support a conclusion that the reports at issue might be admissible under an exception to the hearsay rule, and the main opinion did not address that possibility. As Judge Crawley points out, in his special concurrence, the holding reached by the main opinion in Y.M. “ may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds’ ” 872 So.2d at 173 (quoting Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), quoting in turn Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)) (emphasis added). However, the fact that three members of this court concurred in the result reached by the main opinion in Y.M. may also be viewed as indicating that under the narrow facts of that case, and based on the limited arguments presented to this court in that case, the judgment was due to be reversed. The vote line in Y.M. reveals that every judge on this court agreed to reverse the trial court’s judgment because the court reports constituted inadmissible hearsay under the facts of that case; the vote line does not necessarily indicate that every judge on this court agreed with the rationale for that reversal. The fact that some judges concurred in the result in Y.M. did not necessarily foreclose the possibility that, under different facts or upon the presentation of other legal theories, those judges might reach a different result than they reached in Y.M. This discussion should not be construed as an indication of those judges’ positions when presented with a fact situation similar to the one presented in Y.M. Rather, it is possible to interpret Y.M. as concluding that the trial court erred in admitting the court reports — in that case. We reiterate the conclusion of the Supreme Court of Alabama that “[t]he precedential value of the reasoning in a plurality opinion is questionable at best.” Ex parte Discount Foods, Inc., 789 So.2d 842, 845 (Ala.2001) (citing Ex parte Achenbach, 783 So.2d 4 (Ala.2000)). Therefore, this court’s plurality opinion in Y.M. does not definitively support the mother’s hearsay argument.
However, we need not reach that issue because we conclude that any error the trial court might have committed in admitting DHR’s Exhibit 4 was harmless. See Rule 45, Ala. R.App. P. The material contained in DHR’s Exhibit 4 was cumulative of a great deal of other evidence, all of which was admitted into evidence without objection.[1] This court has held that, assuming a document that is allegedly inad *171 missible on hearsay grounds is admitted into evidence, the error, if any, is harmless where the admitted document is corroborated by in-court testimony or is otherwise cumulative. See J.L. v. State Dep’t of Human Res., 688 So.2d 868, 871 (Ala.Civ.App. 1997); J.V. v. State Dep’t of Human Res., 656 So.2d 1234, 1237 (Ala.Civ.App.1995); Menniefield v. State Dep’t of Human Res., 549 So.2d 496, 500 (Ala.Civ.App.1989). Therefore, because we conclude that the report to which the mother objected contained information that had already been admitted into evidence without any objection, we conclude that any error in the admission of DHR’s Exhibit 4 was harmless.
The mother also argues that she was denied the right to counsel because her appointed attorney, who asked to be notified of the time and place of scheduled ISP meetings, was not notified by DHR of those meetings. The mother contends that if her attorney had been present at the meetings, the attorney could have informed her that any agreements reached during the ISP meetings and any failure on her part to attend those meetings or to cooperate with DHR during those meetings could later be used against her in a proceeding to terminate her parental rights. The mother moved to “quash the ISPs,” seeking to exclude any testimony concerning the contents of the ISPs and any goals set forth in the ISPs that she had failed to meet.
Rule 660-5-47-02(15), Ala. Admin. Code, defines an “Individualized Service Plan (ISP)” as follows:
“The case plan which is created in partnership with the members of the child and family planning team. It includes identification of the child(ren) and family’s strengths and needs; goals the children) and family work toward to reach the desired case outcome; and steps to-be taken by individual child and family planning team members to authorize and deliver services, and to measure progress toward goals.”
Rule -660-5-47-.02(3), Ala. Admin. Code (Dep’t of Human Resources), defines the “child and . family planning team” as follows:
“The individuals involved in planning and/or delivery of services for a child and family. The team shall include the age-appropriate child, the parent(s), others requested by the child or family, the DHR worker(s), the foster care provider and other service providers if any. Their work product is known as the individualized service plan (ISP).”
(Emphasis added.)
By the time of the ISP meetings, the mother already had counsel who had been appointed at the earlier dependency hearing. The mother was not denied counsel at the ISP meetings because, for all that appears from the record on appeal, she did not request that counsel be present. As the emphasized portion of Rule 660-5-47-.02(3) indicates, the mother could have requested that her attorney be a part of the “child and family planning team” present at the ISP meetings. The mother did not allege or prove that DHR prevented her from conferring with her attorney or that it prohibited her from having her attorney present at the ISP meetings. The mother contends that DHR should have notified her attorney of the ISP meetings. Although the mother’s attorney stated in open court that she had requested to be informed of the meetings, the attorney did not state what, if any, response DHR made to her request. In the absence of evidence indicating that DHR responded affirmatively and indicated that it agreed to notify the mother’s attorney of the ISP meetings, we conclude that DHR had no duty, based on the mother’s attorney’s re *172 quest, to inform the attorney of the ISP meetings.
As authority for her argument that DHR did have a duty to notify her attorney of the ISP meetings, the mother cites only cases construing the Sixth Amendment right to counsel. She argues that an ISP meeting is a “material stage” of a termination-of-parental-rights proceeding at which, she contends, she must either waive counsel or be provided with assistance of counsel. The Sixth Amendment right to counsel does not apply in a proceeding involving the termination of parental rights. That amendment is, by its terms, applicable only in criminal proceedings. U.S. Const. Amend. VI. See also Ala. Const.1901, Art. I, § 6. “[T]he Sixth Amendment right to counsel is at issue only where advisory judicial criminal proceedings have been initiated against the [accused] and where the [accused] lacks assistance of counsel at a critical stage in the proceedings.” Ex parte Stewart, 858 So.2d 901, (Ala.2002). See generally. Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
The definition of an ISP in Rule 660-5-47-02(15) makes it clear that an ISP meeting is not intended to be an adversarial proceeding. Instead, it is intended to be a. cooperative review of a plan developed by, among others, the parent and DHR; the purpose of that plan is to correct the conditions that were the basis of the removal of the child from the parent in the first place. An ISP meeting is not an “accusatory” proceeding. Therefore, even if Sixth Amendment right-to-counsel jurisprudence applied here, which it does not, the assistance of counsel would not be required at an ISP meeting. See Moran v. Burbine, 475 U.S. 412, 414, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding that the Sixth Amendment right to counsel attaches “only when the government’s role shifts from investigation to accusation”).
The mother has not raised a due-process claim with regard to her right-to-counsel argument. Therefore, we do not address whether she might have a right to counsel under that theory. See McLemore v. Fleming, 604 So.2d 353 (Ala.1992) (it is not the function of the appellate courts to create an argument for an appellant).
In her reply brief, the mother argues for the first time that the trial court’s judgment should be reversed because, in entering that judgment, the trial court did not specifically state that its factual determinations were supported by “clear and convincing evidence.” It is well settled that an appellant may not raise a new issue in a reply brief. Byrd v. Lamar, 846 So.2d 334, 341 (Ala.2002); Huntley v. Regions Bank, 807 So.2d 512, 516 n. 2 (Ala.2001); Sanders v. Smitherman, 776 So.2d 68, 73 n. 4 (Ala.2000); Perkins v. Dean, 570 So.2d 1217, 1220 (Ala.1990); Kennesaw Life & Accident Ins. Co. v. Old Nat’l Ins. Co., 291 Ala. 752, 754, 287 So.2d 869, 871 (1973). Therefore, this court does not address that issue.
The mother has not argued on appeal that the evidence does not support the trial court’s judgment, and she has failed to show error as to those issues she did raise in her brief to this court. The judgment is due to be affirmed.
AFFIRMED.
YATES, P.J., and THOMPSON, J„ concur.
CRAWLEY, J., concurs specially.
PITTMAN and MURDOCK, JJ„ concur in the result.

. That evidence included a January 8, 2000, impact family counseling report; court reports compiled by DHR social workers and dated January 21, 2000, April 20, 2000, July 19, 2000, October 12, 2000, April 19, 2001, and June 12, 2001; a January 11, 2001, UAB TASC client report; and an impact monthly report for February 2001.