PER CURIAM.
T.D.M. was convicted of one count of sexual abuse in the first degree and one count of sodomy in the first degree. The record shows that at the end of T.D.M.’s trial on August 16, 2007, the jury first returned verdicts of guilty on the sexual-abuse charge and not guilty on the sodomy charge. The jury was then discharged, and the jurors left the courtroom. After a short time, during which proceedings continued in the courtroom, the circuit clerk entered to inform the judge that the not-guilty verdict had been entered as a result of a clerical error. The trial court then recalled and polled the jury, and each juror stated that his or her vote on the sodomy count was guilty.
After the issue was briefed by both sides, the trial court heard testimony at the sentencing hearing held on September 15, 2008, as to the events that transpired between the jury’s discharge and its recall. Ultimately, the trial court entered a judgment finding T.D.M. guilty on the sodomy charge and passed sentence accordingly.
T.D.M. appealed to the Court of Criminal Appeals, seeking a reversal of his convictions on several grounds. That court affirmed T.D.M.’s convictions. T.D.M. v. *935 State, 117 So.3d 921 (Ala.Crim.App.2010). T.D.M. filed a petition for the writ of certiorari in this Court, seeking review of the Court of Criminal Appeals’ decision. This Court granted certiorari review solely to determine whether T.D.M.’s constitutional rights against being placed twice in jeopardy, under the Fifth Amendment to the United States Constitution and art. I, § 9, of the Alabama Constitution of 1901, were violated when the jury returned a not-guilty verdict on the sodomy count, was discharged, left the courtroom, and then returned and changed its verdict. We hold that, under the circumstances of this case, T.D.M.’s rights against double jeopardy were violated, and we reverse and remand.

Facts and Procedural History

The record reflects that at the end of T.D.M.’s trial the jury entered the courtroom at 5:19 p.m. after completing its deliberations. The following then occurred:
“THE COURT: You may be seated. Has the jury reached a verdict?
“FOREPERSON: We have, Your Hon- or.
“THE COURT: Please read the verdict.
“FOREPERSON: We, the jury, find the defendant, [T.D.M.], guilty of the offense of sexual abuse in the first degree as charged in count one of the indictment. We, the jury, find the defendant, [T.D.M.], not guilty of the offense of sodomy as charged in count two of the indictment.’
“THE COURT: What says the State?
“[Prosecutor]: The State’s satisfied, Your Honor.
“THE COURT: What says the defendant?
“[Defense counsel]: We don’t want you to poll, Judge, if that’s what you’re asking. And we want to make a post-trial motion.
“THE COURT: Ladies and gentlemen, on behalf of the lawyers involved in this case; our Circuit Clerk, ...; the Sheriff; and the other judges in this circuit, we thank you for your time. We hope you have enjoyed your experience. This concludes your jury service for the week. [The clerk’s] office has prepared your checks and your excuses. You will now be free to go.
“However, if you desire to stay around and talk to the family members or any of [the] lawyers, you may. That is up to you. Again, it was a pleasure meeting you. [The clerk] will take your badges. He will also hand you the information you need to go. Ladies and gentlemen, you will remain seated until after the jurors have been excused.”
The jury was excused at 5:21 p.m., after which the following transpired:
“THE COURT: [T.D.M.], based on the jury finding you guilty of the offense of sexual abuse in the first degree, Pm going to find you guilty of the offense of sexual abuse in the first degree. Based on the jury’s verdict of finding you not guilty of the offense of sodomy in the first degree, Pm going to find you not guilty of the offense of sodomy in the first degree. Do y’all want a presen-tence report?
“[Defense counsel]: Yes, Your Honor.
“THE COURT: Is the defendant going to remain on the same bond?
“[Prosecutor]: Yes, sir. Your Honor.
“THE CLERK: Excuse me. Judge.
“WHEREUPON, an off-the-record discussion was held.
“THE COURT: The foreperson signed the wrong one.
“[Defense counsel]: What happened?
*936 “THE COURT: They read the wrong verdict form. She signed the wrong verdict form. Bring the foreperson in....
“THE COURT:- [Foreperson], you handed the Court the jury verdicts and you represented to the Court that you gave the Court incorrect information. “FOREPERSON: Yes, sir.
“THE COURT: Explain that to the Court.
“FOREPERSON: Well, when I stood up to read, I realized that I had signed the wrong one. We agreed on both counts of guilty.
“THE COURT: And the form you handed me is indicating not guilty?
“FOREPERSON: Right.
“THE COURT: And you are saying that is not the jury’s verdict?
“FOREPERSON: No. That wasn’t our verdict.
“THE COURT: What says the State?
“[Prosecutor]: Your Honor, it appears that there has been a clerical mistake. And I think that they should be allowed to adjust that.
“[Defense counsel]: Judge, under double-jeopardy laws, the jury — she signed the verdict, she published the jury verdict and the State did not request that the jury be polled. The Court actually entered judgment after that. Under double-jeopardy laws, you can’t go back and change it. It is what it is. It wouldn’t be any different if they read a guilty verdict. Once they make the verdict and they publish it and the Court accepts it and neither party asks for a polling of the jury, neither party objected to anything about the verdicts and the Court has actually entered judgment and that prevents him from being put back in jeopardy for that crime.
“[Prosecutor]: Your Honor, this case is not being tried again. This is part of the process. I mean, she — the foreman made a mistake. We don’t suspect that there’s been any bad faith on her part, just human error.... They just want to go in and correct what the verdict should accurately reflect, and that’s a guilty verdict on both counts.
“THE COURT: We’ve put all the information on the record. I’m going to bring the jurors back in, and let them make their representation to the Court. And I’ll give y’all a chance to make an issue. Since I’ve already entered the judgment and accepted these verdicts, I’m going to let that stand. As soon as I receive y’all’s briefs, I’ll re-address this issue.... We’ll let the jurors correct it and explain as to the reason why they did this.”
The jury returned to the courtroom at 5:30 p.m. The following exchange then took place:
“THE COURT: [Foreperson], it’s my understanding you would like to make a correction for the Court concerning the verdict. What is the jury’s verdict as to count two in the indictment?
“FOREPERSON: We, the jury, find the defendant, [T.D.M.], guilty of the offense of sodomy first degree as charged in count two of the indictment.’ ”
The court then polled the jury. Each juror answered in the affirmative the question: “Is that your verdict?” The court then entered as exhibits the three written verdicts, representing a finding of guilty on the charge of sexual abuse and findings of both guilty and not guilty on the charge of sodomy.
At the sentencing hearing 13 months after the trial, the trial court informed the parties that it had tried to “certify the matter” to this Court and that this Court *937 had indicated that that was not possible.[1] The trial court then stated that it had reviewed the file and the testimony and that it was going to find T.D.M. guilty on both counts and receive the guilty verdict from the jury on the sodomy charge.
After the trial court stated that it was going to find T.D.M. guilty on both counts, the clerk was called by the prosecution to testify as to what had transpired between the jury’s initial discharge and its recall. He testified that the jurors had been leaving the courtroom while the spectators remained in their seats. The foreperson was the last juror to leave, and as she exited the courtroom she told the clerk that there was a problem — that she had signed the wrong verdict form. The clerk testified that all the jurors then huddled around him outside the courtroom door. He stated that he closed the door, spoke with the foreperson briefly to clarify what she was saying, then told the jurors to remain where they were while he informed the judge. The clerk testified that he did not know whether the jurors discussed the case among themselves between the initial discharge and the recall and that “there could have been” bystanders in the hall at the same time the jury was there, but that he did not remember. The clerk left the jurors outside the courtroom, by themselves, while he reentered the courtroom to speak with the judge. The clerk could not testify as to whether any of the jurors discussed the case with each other or with any bystanders during his absence.
After the clerk testified, other witnesses gave their recommendations for a prison term, for fines, and for restitution. At the end of the hearing, the trial court sentenced T.D.M. to three years in the state penitentiary for both counts, the sentences to run concurrently.

Standard of Review

The operative facts are not disputed; this case presents a question of law. The standard for review for pure questions of law in criminal cases is de novo. Ex parte Key, 890 So.2d 1056, 1059 (Ala.2003).

Discussion

Obvious double-jeopardy implications arise when a jury that has been discharged is recalled and then amends its verdict. The question for double-jeopardy purposes is what constitutes “discharge.”
The Court of Criminal Appeals began its analysis by noting the general rule that a jury cannot be recalled after discharge to amend its verdict. T.D.M., 117 So.3d at 926-27. That court then reviewed federal cases and cases from other states, some holding that a trial court’s declaration that a jury is discharged immediately forecloses the possibility of amending the verdict, and others adopting “functional” approaches to identifying the moment of effective, or legal, discharge. Id. The “functional” approaches define discharge variously in terms of whether the jury has left the presence and control of the court or has had the opportunity to discuss the case with “outsiders,” thereby creating the possibility of tampering. Id.
The Court of Criminal Appeals, implicitly adopting a functional approach to determining the moment of effective discharge, held that T.D.M.’s double-jeopardy rights had not been violated. It based its determination on the following rationale:
“[T]he jury remained on the third floor of the courthouse between the time the *938 judge announced that the members were discharged until the time the foreman informed the clerk that she had signed the wrong form. The jury members had not dispersed or conversed with outsiders. The jurors had remained in the hallway just outside the doorway of the courtroom, and the foreman immediately brought the mistake to the clerk’s attention. There was no evidence of any tampering with the members of the jury. Once the members were polled, they all confirmed the verdict as it had been intended.... Therefore, there was no violation of T.D.M.’s double-jeopardy rights.”
117 So.3d at 930 (emphasis added).
In determining that T.D.M.’s double-jeopardy rights had not been violated, the Court of Criminal Appeals relied on cases from other jurisdictions and on the fact that there was no evidence of tampering. We conclude that Alabama jurisprudence has sufficiently addressed the question of when a jury has effectively been discharged to support an analysis that focuses on the presence and supervision of the court rather than on evidence of tampering. Thus, Alabama cases have turned on the opportunity for tampering or improper extrajudicial contact even in cases that presented strong evidence indicating that no jury tampering or improper contact had occurred.
In Alabama, a jury may amend its verdict at any time before it is discharged, but “it is equally clear under our authorities that the discharge of the jury by the trial court ends their consideration of the case.” Preferred Risk Mut. Ins. Co. v. Stuart, 395 So.2d 980, 986 (Ala.1981) (citing St. Clair v. Caldwell & Riddle, 72 Ala. 527 (1882)). Preferred Risk and other cases from this Court have provided consistent guidance as to when a jury is “discharged” for all purposes.
In Brister v. State, 26 Ala. 107 (1855), the jury read its verdict aloud in court and was dismissed before the judge realized that some defendants, who had been placed in jail, were not in the courtroom when the verdict was read. Recognizing that the prisoners had a right to be present when the verdict was read, the judge recalled the jury. The jury had been “discharged,” and the jurors had started to leave the courtroom but “had not got out of the bar” when they were recalled. 26 Ala. at 117. This Court held that the jury had not been discharged “in legal contemplation” and that the discharge “was revocable by the court for a time, and was revoked in due time” because the revocation “was almost instantaneous and whilst the jury, as a body, were still continuing to be in the bar, and in the presence and power of the court.” 26 Ala. at 132 (emphasis added).
In Cook v. State, 60 Ala. 39 (1877), this Court expressly declined to extend Brister. In Cook, the jurors read the verdict and were discharged, after which two of the jurors left the courtroom, “all of the others remaining therein.” 60 Ala. at 40. When the court discovered that the defendant had been absent during the reading of the verdict, the two jurors were recalled and a second verdict returned. The two jurors had been gone only five minutes and stated under oath that they had not discussed the case with anyone while they were absent from the courtroom. Id. This Court still held that it was error for the jurors to have been recalled to return a verdict after the jurors had dispersed, even though the verdict did not change between the reading of the first verdict and the reading of the second. 60 Ala. at 41-42.
The Court of Appeals summarized this Court’s jurisprudence on this issue in Hayes v. State, 44 Ala.App. 499, 501-02, 214 So.2d 708, 710 (1968), as follows:
*939 “When a jury has been discharged by the court and has left the courtroom so as to place themselves beyond the immediate, continuous control of the court, their connection with the case ceases to exist and thereafter that case is beyond their control.” (Emphasis added.) In Hayes, the jury read its verdict in court and was discharged. After the jurors left the courtroom, it was discovered that the jurors had returned two written verdicts, although they had been instructed to return only one. The court sent the bailiff to retrieve the jurors. The bailiff returned “15 or 20 minutes” later with “some” of the jurors, and the other jurors returned a few minutes after that. 44 Ala.App. at 500-01, 214 So.2d at 710. The Court of Appeals held that “once the jury has been discharged and left the court’s control, they could not thereafter be resummoned in order to correct or amend a verdict which is insufficient in substance.” 44 Ala.App. at 502, 214 So.2d at 710 (emphasis added).
This Court again examined the question in Preferred Risk, supra, where a jury was recalled to reconsider its verdict after it had been discharged. After the jury in Preferred Risk had returned its verdict and had been discharged, the jurors moved from the jury box but remained in the courtroom while the judge and defense counsel left the courtroom. A juror then approached plaintiffs counsel and started an ex parte conversation with him concerning the jury’s understanding of its verdict. Based on that conversation, the plaintiffs counsel summoned defense counsel to the judge’s chambers. As a result of the ensuing conversation, the judge reassembled the jury, the jury was asked to deliberate further, and a new verdict resulted. 395 So.2d at 981-85. The jury in Preferred Risk, unlike the juries in Brister and Hayes, did not physically leave the courtroom between discharge and recall. The Court in Preferred Risk ultimately determined that an effective discharge was one in which the jury is “free from the constant supervision and authority of the court,” 395 So.2d at 987 (emphasis added), and determined that the second verdict was error. Id. at 988.
As noted above, a critical concern raised by a jury’s discharge, later recall, and subsequent returning of a verdict is the possibility that jurors could be “ ‘communicated with or tampered with by any person’ ” or “ ‘any outside influence’ ” during the “‘very few minutes that transpired between the time of discharge and recall.’ ” Preferred Risk, 395 So.2d at 988 (quoting Masters v. State, 344 So.2d 616, 619 (Fla.Dist.Ct.App.1977)).
At T.D.M.’s trial, the jury was outside the courtroom and outside the presence and supervision of any officer of the court for a few minutes between its discharge and recall. The clerk testified that he could not remember whether there were bystanders in the hallway while he was there with the jury, and he could not know what transpired while the jury was in the hallway alone. There was an opportunity for an “outside influence” to have been brought to bear on the jurors between the jury’s discharge and its recall.
Another concern raised by the facts of this and similar cases, as this Court discussed in Preferred Risk, is the appearance of impropriety. 395 So.2d at 987. The standard set out by this Court in Preferred Risk is stringent:
“In Edwards v. Seaboard Coast Line R. Co., Ala., 384 So.2d 96 (1980), this Court refused to countenance discussions between the trial judge and individual jurors in chambers, even though the well-meaning trial judge had in his own view substantially recited for the record the entire conversations. Our concern was not only for the impartiality of the tribunal but for the appearance of impartiality as well:
*940 “ ‘Whether or not injury or injustice has resulted to the litigants by reason of the conduct, is not our primary concern. Rather, our concern is with the implication that attaches to the administration of justice under these circumstances. Confidence in our judicial system is imperiled if such conduct is countenanced in jury trials. Conduct which if proved would give rise to doubt and disrespect, or the mere appearance of such conduct as will not meet with the approval of public opinion, must be severely condemned. It is only through the granting of a new trial in situations like this, as well as vigilant efforts by the officers of the court to prevent such occurrences, that public confidence in the jury system may be preserved. Rasmussen v. Miller, 268 Wis. 436, 68 N.W.2d 16, 18 [(1955)]. [Quoting from Daniels v. Bloomquist, 258 Iowa 301,138 N.W.2d 868, 872 (1965).]’
“In our view, those statements apply with equal force to the situation before us. It is doubtful that the purest motives for exacting duplication can completely and perfectly repeat what may have been exchanged between lawyer and juror when both have been released from the direct control of the supervising judge, or that the appearance of impropriety can be removed. The elimination of suspicion in such instances is too much of a burden on judges and lawyers alike, whatever the motives for the communication, when the latent dis-satisfactions with ad hoc decisions on such issues are available to those who already find it easy to criticize the judicial system and its participants. The integrity of the specific decision and that of the entire system are affected. Recognition of the need to prevent such occurrences is not the application of some mean technicality. What we deal with here is at the very root and branch of the jury system itself. The integrity of that system does not permit such instances to be decided by ‘the length of the chancellor’s foot.’ ”
395 So.2d at 987.
The appearance of impropriety is likewise a concern under the facts before us. The clerk who escorted T.D.M.’s jury out of the courtroom, who spoke with them alone while the courtroom door was closed, who informed the court of the problem with the initial verdict, and who was the only witness to testify later regarding those events, had been a prospective juror in T.D.M.’s case. He was struck from the jury for cause because he stated during voir dire that he was certain, without having heard any evidence, that the defendant was guilty of “something” by virtue of the child’s having accused the defendant and the child’s persistence in her accusations throughout the criminal proceedings. That an officer of the court can constitute an improper or “outside” influence on a juror, however innocent the officer’s intent and behavior, has been established. See, e.g., Edwards v. Seaboard Coast Line R.R., 384 So.2d 96 (Ala.1980) (holding it improper for a trial judge to have had conversations with two individual jurors during breaks in the trial, outside the presence of counsel and the rest of the jury, however pure the trial judge’s intentions).

Conclusion

The jury in T.D.M.’s trial, while in the hallway unattended, was outside the presence and supervision of the court. It is also clear that the jury had an opportunity to communicate with, and, in fact, did communicate with, an “outside influence” during the few minutes between its discharge and recall. Allowing the amended verdict to stand in this case would create an “appearance of impropriety,” though we have no reason to doubt that the clerk’s inten *941 tions were honorable and his subsequent testimony truthful.
The jury delivered a verdict that was sufficient and that became legal when it was accepted by the court.[2] The jury then left the presence and supervision of the coui’t. After that, the jury did not have the power to alter its verdict. Preferred Risk, 395 So.2d at 987. The verdict that was properly delivered found T.D.M. “not guilty” of sodomy in the first degree, as charged, and that is the verdict that must stand. Any subsequent alteration of that verdict under the facts of this case would subject T.D.M. to being placed twice in jeopardy for a crime he had been acquitted of and would thereby violate his double-jeopardy rights under the United States Constitution and the Alabama Constitution.
The Court of Criminal Appeals’ affir-mance of T.D.M.’s conviction for first-degree sodomy therefore must be reversed and the cause remanded to that court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MALONE, C.J., and WOODALL, STUART, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
MAIN and WISE, JJ., recuse themselves.*

. There is no provision in Alabama law or in the Rules of Appellate Procedure providing for an Alabama circuit court to submit a certified question to the Alabama Supreme Court. The record does not contain information regarding the circuit court's reported query to this Court.

. This Court is releasing another case on this date, Ex parte Lamb, 113 So.3d 686 (Ala.2011), with analogous facts and a similar outcome. We note that the problematic recalling of a discharged jury can be avoided in all cases if, before the jury is discharged, the court polls the jury and the court and all counsel review the written verdict form or forms.